UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                          CASE NO. 8:24-cr-20-MSS-CPT

HEIDI RICHARDS
a/k/a Heidi Hastings
a/k/a Heidi Shaffer
a/k/a Heidi Williams

**UNITED STATES' RESPONSE TO THE DEFENDANT'S
MOTION TO DISMISS THE INDICTMENT**

For several years the Defendant violated Microsoft's licensing agreements and federal law. Despite receiving clear warnings from Microsoft that her practices were illegal, the Defendant bought and sold Microsoft product labels and key codes separate from the computer programs that they are designed to authenticate and activate. These illicit practices, which are alleged in detail in the Indictment, fall squarely within the prohibitions set forth in 18 U.S.C. §§ 2318 and 1029. Because the Defendant has not identified any pleading deficiencies in the Indictment, the Defendant's Motion to Dismiss should be denied.

I. BACKGROUND

    A.    **Procedural History**

On January 9, 2024, defendant Heidi Richards, a/k/a Heidi Hastings, a/k/a Heidi Shaffer, a/k/a Heidi Williams, was charged by Indictment with conspiring to traffic in illicit labels designed to be affixed to, enclose, or accompany copies of computer programs, in violation of 18 U.S.C. §§ 371 and 2318 (Count One);

trafficking in illicit labels designed to be affixed to, enclose, or accompany copies of computer programs, in violation of 18 U.S.C. § 2318 (Count Two); trafficking in unauthorized access devices, in violation of 18 U.S.C. § 1029(a)(2) (Counts Three and Four); and possessing 15 or more unauthorized access devices, in violation of 18 U.S.C. § 1029(a)(3).

On April 29, 2024, the Defendant filed a Motion to Dismiss the Indictment (the "Motion) (Doc. 33). The Motion argues that the Indictment should be dismissed because Counts One and Two improperly charge her with violating 18 U.S.C. § 2318 for electronic transmission of labels and for trafficking in copies (in the form of key codes) rather than genuine labels, and because Counts Three through Five fail to allege that product activation key codes are access devices.

**B.      Indictment**

The Indictment alleges that the Defendant, through her software distribution business, conspired with individuals to obtain standalone Certificates of Authenticity ("COA") labels for Microsoft software products and to sell the product activation key codes contained on those labels independently of the copyrighted software program to which they are designed to be affixed, enclosed, or accompany. The Indictment further alleges that the Defendant trafficked in and possessed unauthorized access devices, that is, Microsoft product activation key codes.

The Defendant owned Trinity Software Distribution ("Trinity"), a software

distribution business located in this District. Indictment ¶ 1. This case concerns the Defendant's illegal distribution of Microsoft Corporation ("Microsoft") computer software programs. *Id.* ¶ 2.

As set forth in the Indictment, Microsoft distributes its software products using a variety of channels, including on physical media and through digital download. *Id.* ¶¶ 6-7. Software that is distributed on physical media by an authorized distributor will include COA labels that are intended to demonstrate that the copyrighted computer program is genuine and to signal to the intended end user that the use of the license is non-infringing. *Id.* ¶ 6. COA labels may not be sold on a "standalone" basis separated from the software that they were intended to authenticate. *Id.* ¶ 14.

Digital download of Microsoft software, on the other hand, is available through a limited number of authorized companies or retailers that provide an Internet link to download a copy of the software. *Id.* ¶ 7. In either distribution method, use of the copyrighted computer program is dictated by license terms, which vary based upon the context in which the software is to be used, the number of licenses being purchased, the number of activations permitted under the license, among other things. *Id.* ¶ 8.

Microsoft further ensures that copies of its computer programs are installed in accordance with its license terms by employing the use of product key codes to register and authenticate a software product at installation. *Id.* ¶ 9. A product key

code is a unique alphanumeric code that corresponds with a particular license and the terms and limitations of that license. *Id.* During the activation process, the intended user's computer accesses Microsoft servers to register the software program and verify the product key code relative to the distinctive characteristics associated with its specific license. *Id.* ¶ 10. Upon successful verification, the product key code then unlocks the functionality of the software associated with the license. *Id.* If the product key code is rejected by Microsoft servers because of improper use or access, the software program will not operate. *Id.*

Despite Microsoft's efforts to secure the supply chain for software through authentication of legitimate installations, product key codes may be illicitly obtained via fraud, such as when they are procured or sold without accompanying COAs, distributed in nonsequential order, or sold at prices far below the manufacturer's retail price. *Id.* ¶ 11. Bulk distribution of product key codes via email and spreadsheets is a strong indicator that the key codes are not procured legitimately. *Id.* ¶ 12.

Beginning at least as early as August 11, 2017, the Defendant, doing business as Trinity, conspired with Unindicted Coconspirator-1, doing business as Company A, as well as with others, to traffic in illicit COA labels designed to be affixed to, enclose, or accompany copies of Microsoft Windows 10 Pro computer programs. *Id.* ¶ 17. Unindicted Coconspirator-1 owned Company A, which was located in Texas

and engaged in the business of distributing purported Microsoft software. *Id.* ¶ 3. In or around April 2017, Microsoft sued Company A in federal court for selling unauthorized copies of Microsoft software via internet download and unauthorized product activation keys. *Id.* ¶ 16. In or around October 2017, Company A was enjoined from engaging in those fraudulent practices. *Id.*

The Indictment alleges 13 Overt Acts ("OA") that the Defendant and/or Unindicted Coconspirator-1 committed in furtherance of the conspiracy. For example, the Indictment alleges that Unindicted Coconspirator-1 contacted the Defendant in August 2017 to see if she could "'use any of these' referring to various Microsoft products, including '100 pc' or 'Windows 10 Pro OEM.'" *Id.* ¶ 19a. OEM stands for "original equipment manufacturer," typically referring to licenses of software that is preinstalled on or included with a prebuilt computer or with computer hardware. *Id.* ¶ 8. Neither the Defendant, doing business as Trinity, nor COMPANY A are Microsoft original equipment manufacturers (OEM). *Id.*

The Indictment further alleges instances where the Defendant purchased Microsoft COA labels in bulk from Company A and had the product key codes transcribed from the labels onto spreadsheets so that Trinity could sell the product key codes to customers. For example, on July 24, 2018, the Defendant, doing business as Trinity, purchased from Company A approximately 500 Microsoft Retail Windows 10 Pro and 300 Windows 10 Home COA labels for $22,100. *Id.* ¶ 19b.

Approximately one week later, on August 1, 2018, the Defendant caused a Trinity employee to email two spreadsheets attached to an email with the subject line "'win 10 keys transcribed.'" One spreadsheet was titled, "'QTY 300 WIN HOME KEYS 07262018'"; the other was titled, "'QTY 500 WIN 10 PRO KEYS 07262018.'" *Id.* Then, a few days later, on August 6, 2018, the Defendant caused a Trinity employee to send approximately 20 of the 500 Windows 10 Pro product key codes that the Defendant had purchased on July 24, 2018, from Company A to a customer in the United Kingdom. *Id.* ¶ 19d.

Additionally, the Indictment alleges that Unindicted Coconspirator-1 sold the Defendant product key codes that were transcribed from Microsoft COA labels by Unindicted Coconspirator-1. On or about May 16, 2022, Unindicted Coconspirator-1 sent the Defendant by email a spreadsheet that contained approximately 200 Microsoft Office 2019 Home Business OEM product keys, 100 Microsoft Office 2019 Home Student Retail product keys, and 100 Microsoft Office 2021 Home Student Retail product keys. *Id.* ¶ 19g. That same day, Unindicted Coconspirator-1 had sent the Defendant by email an invoice for the aforementioned product keys that reflected the price per "unit." *Id.* ¶ 19f. Unindicted Coconspirator-1 had contacted the Defendant by email a few days prior soliciting the Defendant's interest in purchasing "'Office 2019 Home Student OEM,'" which he described as "'like the Windows 10 [the Defendant's] been buying with a scratch-off.'" *Id.* ¶ 19e. The email also included

information on "'~1000 pcs Office 2019 Home Student OEM $20.00,'" with an offer to "'transcribe them if needed as well.'" *Id.* Approximately 10 days after receiving the spreadsheet of product key codes, the Defendant paid Company A approximately $41,824. *Id.* ¶ 19h.

As noted above, the Indictment alleges instances in which the Defendant arranged the transcription of key codes contained on COA labels and emailed those codes electronically. The Indictment's allegations, however, are not limited to the digital transmission of product key codes from COA labels. The Indictment also cites multiple instances where the Defendant purchased, and Unindicted Coconspirator-1 mailed to her, physical Microsoft COA labels. In communications beginning on or about November 30, 2022, Unindicted Coconspirator-1 informed the Defendant that he had "'31k units,'" of which he could "'send out that 10k tomorrow and hold however many [the Defendant] want[s] up to 21k.'" *Id.* ¶ 19i. Then, on or about December 5, 2022, the Defendant purchased from Company A approximately 4,988 Microsoft Windows 10 Pro COA labels for approximately $99,760, and approximately 5,000 additional Microsoft Windows 10 Pro COA labels for approximately $100,000. *Id.* ¶ 19j-k. That same day, Unindicted Coconspirator-1 confirmed to the Defendant that he was "'sending that package out for priority delivery,' describing it as 'Precious cargo.'" *Id.* ¶ 19l.

## II. MEMORANDUM OF LAW

### A. Legal Standard

Federal Rule of Criminal Procedure 7(c)(1) provides: "The indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged . . ." An indictment is sufficient if it includes "all elements of the offense and briefly describe[s] the facts of the commission of offense." *United States v. deVegter*, 198 F.3d 1324, 1330 (11th Cir. 1999); *see also United States v. Yonn*, 702 F.2d 1341, 1348 (11th Cir. 1983) (requirements of Rule 7(c)(1) "satisfied by an indictment that tracks the wording of the statute, as long as the language sets forth the essential elements of the crime").

A motion to dismiss an indictment may only be decided prior to trial if the court can rule on the motion "without a trial on the merits." Fed. R. Crim. P. 12(b)(1). This requirement is met only if a "trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the [motion]." *United States v. Covington*, 395 U.S. 57, 60 (1969). Therefore, in analyzing a motion to dismiss, the court is limited to the allegations in the indictment and must read those allegations in the light most favorable to the government. *See United States v. Torkington*, 812 F.2d 1347, 1354 (11th Cir. 1987).

### B. Analysis

**1. Counts One and Two sufficiently allege that the Defendant violated 18 U.S.C. §§ 371 and 2318 by trafficking in physical, illicit labels designed to be affixed to, enclose, or accompany copies of Microsoft computer programs.**

It is well established that an indictment need only set forth the essential elements of the crimes and adequately specify the time, place and participants involved. *See Hamling v. United States*, 418 U.S. 87, 117 (1974); *United States v. Harrell*, 737 F.2d 971, 975 (11th Cir. 1984), cert. denied, 470 U.S. 1027 (1985); *United States v. Ramos*, 666 F.2d 469, 474 (11th Cir. 1982). Here, Count One sufficiently describes the manner and means by which the coconspirators sought to accomplish the objectives of the charged conspiracy (i.e., trafficking in illicit labels in violation of section 2318), identifies overt acts committed in furtherance of the conspiracy, and provides context and specific detail as to the Defendant's scheme. Mot. at 7.

Count Two tracks the language of 18 U.S.C. § 2318 and incorporates the elements of the offense. Federal law criminalizes trafficking in "illicit label[s] affixed to, enclosing, or accompanying, or designed to be affixed to, enclose, or accompany . . . a copy of a computer program." 18 U.S.C. § 2318(a)(1)(B). "The statute targets the secondary market in authenticating labels." *United States v. Harrison*, 534 F.3d 1371, 1373 (11th Cir. 2008). An "illicit label" is a "genuine certificate, licensing document, registration card, or similar labeling component," that meets two criteria. 18 U.S.C. § 2318(b)(4). First, the component must be "used by the copyright owner to verify

9

that a [copy of a work] is not counterfeit or infringing of any copyright." *Id.* at § 2318(b)(4)(A). Second, the component must either be "distributed or intended for distribution not in connection with the copy . . . to which such labeling component was intended to be affixed by the respective copyright owner," *id.* at § 2318(b)(4)(B)(1), or be "knowingly falsified in order to designate a higher number of licensed users or copies than authorized by the copyright owner," *id.* at § 2318(b)(4)(B)(2), without the copyright owner's authorization.

Moreover, the statute references the definition of "traffic" from 18 U.S.C. § 2320(f) (trafficking in counterfeit goods and services), which includes, "to transport, transfer, or otherwise dispose of, to another, for purposes of commercial advantage or private financial gain, or to make, import, export, obtain control of, or possess, with intent to so transport, transfer, or otherwise dispose of." *Id.* at § 2318(b)(2). The Indictment describes multiple instances in which the Defendant obtained control of and possessed COA labels with the intent to transport, transfer, or otherwise dispose of, to another, for purposes of commercial advantage or private financial gain.

The Defendant's reliance on Section 103 of Pub. L. 108-482, the statute's statutory note, is unavailing. Section 103 declares that the prohibitions of 18 U.S.C. § 2318 "shall not be construed to apply" in either criminal or civil cases, to the electronic transmission of genuine labeling components (Sec. 103(a)(1)(A)) and shall not be construed to apply, in civil cases, to the electronic transmission of counterfeit

10

labeling components (Sec. 103(a)(1)(B)). The Motion focuses on the instances described in the Indictment in which the Defendant is alleged to have electronically transmitted key codes transcribed from illicit Microsoft COA labels—conduct that was included for context as to the conspiratorial scheme. But the Indictment also alleges multiple instances in which the Defendant trafficked in actual, physical COA labels. In other words, she "obtained control of and possessed" illicit, physical COA labels, and did so, at a minimum, with the intent to "otherwise dispose of those labels" for purposes of commercial advantage or private financial gain.

For example, Overt Acts 19i through 19l describe two transactions on or about December 5, 2022, between the Defendant and Unindicted Coconspirator-1 in which the Defendant purchased approximately 9,988 "units" of Microsoft Windows 10 Pro COA labels from Unindicted Coconspirator-1 for a total of $199,760. Indictment ¶¶ 19i-k. Moreover, Unindicted Coconspirator-1 confirmed that same day that he was "sending that package out for priority delivery," describing it as "Precious cargo," which plainly relates to the physical labels that the Defendant had purchased. *Id.* ¶ 19l. These overt acts fall squarely within the prohibition against trafficking in illicit labels under 18 U.S.C. § 2318.

The Defendant's second challenge to Counts One and Two fails for similar reasons. The Defendant argues that her electronic transmission of transcribed key codes cannot violate section 2318 because the Indictment does not allege the

11

Defendant "trafficked in 'genuine' illicit labels . . . only in transcribed *copies* of product key codes." Mot. at 10. As explained above, however, in narrowly focusing on the allegations involving the electronic transmission of product key codes that were transcribed from COA labels, the Defendant ignores the allegations that expressly relate to her receipt and possession of physical, illicit COA labels in violation of 18 U.S.C. § 2318.

Because the Motion fails to identify any pleading deficiencies contained in Counts One and Two of the Indictment, it should be denied.

### 2. Counts Three through Five sufficiently allege that the Defendant trafficked in and possessed unauthorized access devices in the form of Microsoft product activation key codes.

The Defendant argues that Counts Three through Five fail to specifically allege that the product key codes accessed any individual accounts, which she believes is necessary to sufficiently charge an access device crime under 18 U.S.C. § 1029. Mot. at 10-13. But that argument is premised on the Defendant's misunderstanding of the functionality of product key codes. As explained below, product key codes exist to activate discrete Microsoft products for certain licensees (i.e., account holders). This conclusion is consistent with the Eleventh Circuit's broad reading of section 1029.

An "access device" is "any card, plate, code, account number, electronic serial number, mobile identification number, personal identification number, or other

telecommunications service, equipment, or instrument identifier, or other means of account access that can be used, alone or in conjunction with another access device, to obtain money, goods, services, or any other thing of value, or that can be used to initiate a transfer of funds (other than a transfer originated solely by paper instrument)." 18 U.S.C. § 1029(e)(1) (emphasis added). The Eleventh Circuit has concluded that this "broad definition" includes "credit cards, debit cards, usernames and passwords, routing and bank account numbers, and merchant account numbers." *United States v. Wright*, 862 F.3d 1265, 1274-75 (11th Cir. 2017) (collecting cases).

     A product key code constitutes an "access device" because of the account it accesses within Microsoft and the contractual relationship it affords via continued access to Microsoft's specific software programs. As explained in the Indictment, the product key code is used during the authorization process to allow an end user to access the full version of Microsoft software. Each product key code is made up of a 25-character alphanumeric code typically grouped in five groups of five characters (e.g., "AB1C2-D3EF4-G567H-8IJKL-MN9OP"). The product key code allows an end user to activate a preloaded or downloaded copy of Microsoft software, such as a Windows operating system or Microsoft Office programs.

     When a product key code is created by Microsoft, it is intended for a specific manner of distribution (e.g., as an OEM code, one offered to members of the

13

Microsoft Developer Network, for retail, or under academic licensing), specific product (e.g., Microsoft Office 2010, Microsoft Office 2010 Student), a discrete number of activations, and in some cases, a geographic restriction. After a product key code is used to authenticate a product, Microsoft servers then create a record of its use, including the date, time, and IP address used to install this program, as well as a configuration snapshot of the computer and operating system used to install this program (to ensure the same computer may reinstall the associated product if necessary—if it is substantively changed, the program may require reactivation). In addition to this information retained upon the installation and activation of a product using a product key code, the process of using a product key code to install software creates another internal record.

After a software product is successfully installed using a digital product key code, a product identification number ("PID") is created by Microsoft, which is then used by Microsoft Customer Service to help identify the product when end users engage customer support. This PID supports the ongoing relationship between the end user and Microsoft, which is a contractual one (since the program use is allowed as per the terms of the licensing arrangement). As per the licensing arrangement, Microsoft is within its rights to revoke an end user's access to these programs if they violate these terms of use. Other "accounts" are likewise implicated in the course of this scheme, since Microsoft has identified numerous abuses with its "volume

licensing" and academic software distribution partners. In essence, Microsoft allows developers or large institutional clients to enter into a "volume licensing" agreement whereby they could obtain key codes at very low amounts.

    Whether software product key codes constitute access devices is a matter of first impression in the Eleventh Circuit. But the Eleventh Circuit has made clear in an earlier, published decision that product key codes fall within the bounds of section 1029. In *United States v. Dabbs*, 134 F.3d 1071 (11th Cir. 1998), the Eleventh Circuit concluded that merchant account numbers fall within the definition of "access device" under section 1029(e)(1). *Id.* ¶ 1081. In holding that section 1029 proscribes using a merchant account number with the intent to defraud, the Eleventh Circuit reviewed the legislative history of the statute, which "clearly shows Congress's intent to prohibit innovative means of access device fraud and contradicts the appellants' attempt to narrowly interpret the statutory definition of 'access device.'" *Id.* at 1080. The Eleventh Circuit observed that "Congress sought to enact 'broader statutory language in an effort to anticipate future criminal activities.'" *Id.* at 1081 (quoting S.Rep. No. 98–368, at 5, *reprinted in* 1984 U.S.C.C.A.N. 3647, 3651). Accordingly, it is "appropriate to broadly construe the statutory language of section 1029 to include the innovative means that parties use to gain unauthorized information to engage in fraudulent activities." *Id.* at 1081.

    In light of the broad reading of section 1029(e)(1) that the Eleventh Circuit has

15

endorsed, *United States v. Brady*, 13 F.3d 334 (10th Cir. 1993), and the Eleventh Circuit's discussion of *Brady* in *United States v. Morris*, 81 F.3d 131 (11th Cir. 1996), do not help the Defendant. In *Brady*, the Tenth Circuit held that altered cellular telephones used for purposes of free riding on the cellular telephone system were not access devices within the meaning of section 1029. *Id.* at 338-39. The *Brady* court explained that the Tenth Circuit had previously applied section 1029 to the unauthorized use of credit cards and long distance telephone access codes, but it had refused to apply the statute to electronic addresses of satellite television descramblers. *Id.* § 338. The *Brady* court took a narrow view of the statute, concluding that section 1029 applies only to "access to an identifiable account for which a record is created and maintained." *Id.* at 339.

      Even if the Eleventh Circuit's reading of the definition of "access device" is limited to access to identifiable accounts only—which it is not—the product key codes alleged in the Indictment pass muster. In fact, the *Brady* court's analysis supports the government's position in this case. Like the long distance telephone access codes and unassigned credit card account codes referenced in *Brady*, the licenses (accounts) to be activated by product key codes are legitimate and created for future use, and each time a product key code is used to activate a license, that activation (or attempt) appears in a record created and maintained by Microsoft for a particular license. *See id.* at 339.

16

The civil case that the Defendant cites, *Synopsys, Inc. v. Ubiquiti Networks, Inc.*, 2017 WL 3485881 (N.D. Cal. Aug. 15, 2017), is also inapposite. Unlike in *Synopsys*—in which the plaintiff's fraud claims received heightened scrutiny under Federal Rule of Civil Procedure 9(b)'s particularity requirement—there is no requirement under Federal Rule of Criminal Procedure 7(c) or section 1029 case law that the Indictment allege "facts describing the actual or functional account" that product keys are used to access to "obtain money, goods, or services, or any other thing of value." *Id.* at *14; *see Yonn*, 702 F.2d at 1348 (indictment that tracks language of statute is sufficient as long as essential elements are alleged). What's more, in allowing the plaintiff to amend its claim, the *Synopsys* court observed that "nothing in the language of [Section 1029] excludes its application to this type of case." *Id.*

In short, product key codes, by their nature and use, constitute access devices. They are used to activate a license to a software program, which creates a record for Microsoft that the license in question has been accessed and authorizes full use of the program for the licensee. Absent product key codes use in this process, a particular software program would be rendered near useless—no better than a freely obtained trial copy of a software program. In other words, the activation and authentication process accesses a registry maintained by Microsoft, meaning that an "account" is accessed in the course of this process. These codes are used to "obtain

17

money, goods, services, or any other thing of value"—the full and unfettered access to a working copy of the software program.

Counts Three through Five of the Indictment, therefore, sufficiently allege that product key codes are access devices.

### III. CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court deny the Defendant's Motion to Dismiss.

Respectfully submitted,

ROGER HANDBERG
United States Attorney

By: /s/ Risha Asokan
Risha Asokan
Assistant United States Attorney
Florida Bar No. 1003398
400 N. Tampa St., Ste. 3200
Tampa, FL 33602-4798
Telephone: (813) 274-6000
Facsimile: (813) 274-6358
E-mail: risha.asokan2@usdoj.gov

U.S. v. Heidi Richards                                          Case No. 8:24-cr-20-MSS-CPT

## CERTIFICATE OF SERVICE

I hereby certify that on May 20, 2024, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to the following:

    Kevin Darken, Esq.
    Todd Foster, Esq.

                                                */s/ Risha Asokan*
                                                Risha Asokan
                                                Assistant United States Attorney
                                                Florida Bar No. 1003398
                                                400 N. Tampa St., Ste. 3200
                                                Tampa, FL 33602-4798
                                                Telephone: (813) 274-6000
                                                Facsimile: (813) 274-6358
                                                E-mail: risha.asokan2@usdoj.gov